## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **WILLIAM SUMMERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 15 C 7820** |
| **v.** | ) | |
| | ) | **Magistrate Judge** |
| **NANCY A. BERRYHILL, Acting** | ) | **Maria Valdez** |
| **Commissioner of the U.S. Social** | ) | |
| **Security Administration,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision

of the Commissioner of Social Security (the "Commissioner") denying Plaintiff

William Summers' ("Plaintiff") claim for Social Security Disability Insurance

Benefits ("DIB"). The parties have consented to the jurisdiction of the United States

Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow,

Plaintiff's Motion for Summary Judgment [Doc. No. 20] is granted and the

Commissioner's Cross-Motion for Summary Judgment [Doc. No. 21] is denied.

## BACKGROUND

### I.      Procedural History

The Plaintiff filed his dual applications for DIB and Supplemental Security

Income ("SSI") on March 1, 2012, alleging a disability onset date of May 11, 2007

due to diabetes, knee pain, degenerative disc disease, and neuropathy. (R. 167, 169.)

---

[1] Nancy A. Berryhill is substituted for her predecessor, Carolyn W. Colvin, pursuant to Federal Rule of Civil Procedure 25(d).

The Plaintiff's application for SSI was granted on May 9, 2012 finding the Plaintiff had: major joint dysfunction, Diabetes Mellitus, peripheral neuropathy, and spine disorders, and finding the Plaintiff was disabled because the Plaintiff's disability met Listing 1.02A. (R. 73, 77;) *see also* 20 C.F.R. pt. 404P, § 1.02A. However, the Plaintiff's application for DIB was denied on May 9, 2012, and was again denied upon a December 11, 2012 reconsideration. (R. 76, 87.) The Plaintiff then timely requested a hearing before an Administrative Law Judge ("ALJ") on December 21, 2012. (R. 103.)

The hearing was held on September 3, 2013 before ALJ Lorenzo Level. (R. 31-63.) The Plaintiff personally appeared and testified at the hearing, and was represented by counsel. (*Id*.) Vocational Expert ("VE") James Breen also testified. (*Id*.) The ALJ issued a written opinion on February 28, 2014, denying the Plaintiff's claim for DIB and finding him not disabled under the Social Security Act. (R. 14-30.) The Social Security Administration Appeals Council ("AC") then denied the Plaintiff's request for review on July 14, 2015, leaving the ALJ's decision as the final decision of the Commissioner, and therefore reviewable by the District Court under 42 U.S.C. § 405(g). (R. 1-6.); *see also Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II.    Factual Background[2]

The Plaintiff was born on July 25, 1956 and was fifty-seven years old at the time of his administrative hearing. (R. 34.) He has completed some high school and

---

[2] The following facts from the parties' briefs are undisputed unless otherwise noted.

lives with his wife in Wood Dale, IL. (R. 72, 212, 214.) Between 1984 and 2007, the Plaintiff held various jobs in carpentry and carpet installation, inspection, and maintenance. (R. 222.) The Plaintiff stopped working in October of 2007 allegedly due to back and leg pain, and fatigue. (R. 68-69.)

A. **Medical Evidence**

Although the Plaintiff presented treatment records between the years 2005 and 2007, the Plaintiff's records contain a large gap between 2007 and 2012, when the Plaintiff resumed treatment with his primary care physician Dr. Narendra Dabhade, M.D.

The Plaintiff first presented to Rush Oak Park Hospital on September 9, 2005, complaining of a history of lower back discomfort with radiation to the right lower extremities. (R. 312.) The Plaintiff was treated by Dr. Sandeep Amin, M.D., and received an epidural steroid injection. (*Id*.) The Plaintiff received two additional epidural steroid injections from Dr. Amin on September 24, 2005 and October 7, 2005. (R. 315, 318.)

The Plaintiff also presented to Dr. Dabhade on March 9, 2006 complaining of low back pain. (R. 320). The Plaintiff's spine was imaged using a magnetic resonance imaging ("MRI") scan. (*Id*.) The MRI revealed degeneration of the L4-L5 and L5-S1 intervertebral discs with some degree of loss of hydration, and a mild degree of degenerative changes of the L3-L4 discs. (*Id*.) The MRI also revealed minimal disc space narrowing at L5-S1 and some degree of fatty marrow signal of the endplates. (*Id*.) The MRI lastly found no focal disc herniation, disc forming or

spinal stenosis at all levels of the lumbar spine and visualized thoracic spine. (*Id.*)

No significant change was found between the Plaintiff's MRI and a prior lumbar

MRI on September 14, 2004. (*Id.*)

The Plaintiff returned to Dr. Dabhade on June 21, 2006 complaining of pain

in his right buttock radiating down to his big toe, which caused tingling and

numbness on the plantar aspect of the foot with some burning pain. (R. 321.) Dr.

Dabhade found the Plaintiff had right mild chronic L4-5, S1 radiculopathy; fairly

severe right polyneuropathy, more so involving the peroneal nerves; and that the

peripheral neuropathy is most likely secondary to Diabetes Mellitus. (R. 322.)

The Plaintiff also presented to Dr. Dabhade on an outpatient basis on

October 9, 2007; November 20, 2007; and December 4, 2007, generally complaining

of constant 3/10 or 4/10 pain and weakness, that progressed to 7/10 pain in his

upper limbs, right lower limb, and lower back. (R. 334-37.) This pain caused the

Plaintiff to be unable to sleep, and caused him pain when performing other bodily

functions such as sneezing, coughing, or swallowing. (*Id.*) Dr. Dabhade diagnosed

the Plaintiff with Diabetes Mellitus, peripheral neuropathy, lumbosacral

radiculopathy, myalgia, joint pain, and frozen shoulder. (*Id.*) For those ailments, Dr.

Dabhade prescribed Glimepiride, Metformin, Gabapentin, Benicar, Prevacid, and

Vicodin. (*Id.*) Likewise, on November 8, 2007 Dr. Dabhade recommended the

Plaintiff use a walker due to osteoarthritis of the lower leg and lumbosacral

radiculopathy. (R. 251, 253-54, 349.)

The Plaintiff resumed treatment with Dr. Dabhade approximately five years later on April 6, 2012, in relevant part complaining of severe pain in the legs with muscle spasms; chronic lower back, knee, and neck pain; difficulty bending, stooping or sitting for any period of time; difficulty walking more than 10-15 feet due to pain; and tingling and numbness in the extremities. (294-96, 327-32, 341-44, 347.) Dr. Dabhade found that the Plaintiff also had limited flexion in both knees. (*Id.*) Dr. Dabhade further summarized his findings from his consultation in an April 17, 2012 submission to the Commissioner, stating the Plaintiff had marked tenderness in the lower back at a 10/10 level of pain; marked tenderness of both knees with 45 degree flexion; upper right back tenderness; and cervical tenderness of 2+. (R. 345.) Dr. Dabhade also found the Plaintiff to have chronic low back pain with "DJD L.S. Spine [degenerative joint disease of the lumbar spine]" with spinal stenosis; chronic neck pain with cervical radiculopathy; chronic knee pains with severe arthritis and severe limitation in mobility; Diabetes Mellitus uncontrolled with peripheral neuropathy; obesity; and gait disorder with back and leg pains and spasms. (R. 346.) In Dr. Dabhade's opinion, the Plaintiff was totally disabled and was not able to engage in any gainful activity. (*Id.*) Though the Plaintiff presented additional medical records following these visits, they are largely illegible or pertain to ailments not applicable here.

### B.    Plaintiff's Testimony

The Plaintiff also presented at the administrative hearing and offered his testimony. (R. 37-57.) The Plaintiff testified that his last full-time job was in 2006

5

as a carpet inspector. (R. 40.) There, he was required to lift his approximately 45-pound tool box, but he later lightened its weight to approximately five pounds. (*Id.*) The Plaintiff also testified that his pain would cause him problems with his job performance as he would have difficulty going up and down stairs or getting on his knees to examine problems. (*Id.*)

The Plaintiff also testified that he only had minimal miscellaneous work activity after he left his final full-time position in 2007, working part-time for a maximum of a two or three months. (R. 37.) At this part-time employment, he was required to manipulate small packages between five and fifteen pounds, and had to quit when he was asked to lift heavier boxes. (*Id.*) The Plaintiff also had to drive for this employment; however, while the Plaintiff could tolerate shorter driving periods of about ten minutes, the Plaintiff stated he could not tolerate driving for periods of 45 minutes to an hour. (R. 38.) For longer assignments, he would have to get out of the truck to stretch. (*Id.*)

The Plaintiff also worked for the Northwest Package Delivery Company in 2008, where he was responsible for delivering small envelopes. (R. 43-44.) The Plaintiff testified that he had no trouble performing the job, but the driving aspect of the job bothered him because he would be sitting for hours at a time. (R. 44.) He would try to get up and stretch every 30 minutes, but could otherwise not stay in the car very long.

Regarding the Plaintiff's symptomatology, the Plaintiff testified he first began having pain in the early 2000's. (R. 39.) The Plaintiff's pain begins in his

lower back and shifts over to the right hip and down behind the back of the leg. (*Id*.)
The Plaintiff also testified he received an MRI at the West Lake Hospital and he
was told that he had nerve damage, and could not feel any sensation during his
tests, but for some sensation in his toes. (R. 41.) Similarly, the Plaintiff stated that
his doctors diagnosed him with diabetes and that this diabetes also compounds his
pain and symptoms. (R. 44.) The Plaintiff stated his diabetes causes him to have
blurry vision even with glasses. (*Id*.)

Regarding the Plaintiff's course of treatment, the Plaintiff also presented to
the hearing with his walker and cane, which he stated he received in the summer of
2007 from Dr. Dabhade. (R. 42.) Dr. Dabhade prescribed the cane and walker on
November 8, 2007 because the Plaintiff claims he was falling often. (R. 42, 340.) The
Plaintiff testified he uses the walker almost every day, and also inside the home. (R.
52.) The most substantial reason for the cane and walker however was the
Plaintiff's difficulty climbing stairs. (R. 43.) He stated that his difficulty climbing
stairs was so great that he would sleep on the first floor of his house. (*Id*.) Likewise,
the Plaintiff estimated he would only be able to walk about 20 to 30 feet before
experiencing pain. (*Id*.) This prevents him from leaving his house, and he testified
he does not go anywhere often. (*Id*.)

The Plaintiff also has received steroid injections, ice treatment, and massages
for his pain, beginning in 2001. (*Id*.) These treatments only temporarily relieved his
pain. (*Id*.) To control the numbness in his legs, the Plaintiff ices his legs, and uses
Icy-Hot. (R. 45.) Likewise, the Plaintiff states he elevates his legs all of the time,

and has been doing so since 2007 and 2008, when he had the most severe pains. (*Id*.) The Plaintiff specifically will sit in his walker for the maximum amount of time possible, usually between 20 and 30 minutes. (*Id*.) While lifting the legs helped, laying down was the most helpful. (R. 45.) The Plaintiff states that lying down has provided the most pain relief since 2010. (*Id*.) The Plaintiff also mentioned attending rehab for his legs between 2002 and 2006, which was effective for him. (R. 55.)

The Plaintiff similarly testified that he used to take a variety of pain medications. (R. 50.) The Plaintiff claimed that he used to take about 21 pills a day, which provided him no relief and caused him dry mouth. (*Id*.) The Plaintiff also would consume ibuprofen four to five times a day. (R. 51.) He likewise no longer sought treatment between November of 2007 and April of 2012 because he did not have health insurance after November of 2007. (*Id*.) Similarly, the Plaintiff testified he sought out free, sliding fee scale coverage, or public assistance, but could not secure any because his wife works a part-time job. (*Id*.)

The Plaintiff also stated that he discussed with Dr. Dabhade the possibility of undergoing hip replacement or knee replacement surgery between 2000 and 2005. (R. 56.) The Plaintiff did not undergo the surgeries because he stated that he has heard that the surgery makes your condition worse. (*Id*.) Regarding the Plaintiff's work-related restrictions, the Plaintiff testified that prior to his prescription of a walker, Dr. Dabhade imposed various work-related restrictions on him. Specifically,

the Plaintiff was instructed to drive no more than 30 minutes in a vehicle, no heavy lifting, and no bending. (R. 56.)

Regarding the Plaintiff's activities of daily living, the Plaintiff claims that he now remains at home most of the day. (R. 46.) Starting in 2010, he has received help from his wife when doing activities of daily living. (R. 47.) While the Plaintiff testified he can do the majority of activities of daily living on his own, the Plaintiff's wife makes sandwiches for lunch; helps the Plaintiff in and out of the tub; and washes the Plaintiff's back and feet. (*Id.*) The Plaintiff claims he has required more help since 2010, as he was not able to lift his legs or cross them, nor could he leave the tub without slipping. (*Id.*) Likewise, the Plaintiff claims that he cannot do lawn work because he cannot pick up anything or squat. (R. 48.) The Plaintiff also testified he sometimes goes grocery shopping but mostly remains in the car. (*Id.*) The last time the Plaintiff went into the grocery store was a month prior to the hearing and he mostly hangs onto the cart or uses motorized carts. (R. 49.) The Plaintiff also sometimes falls in the store without warning. (*Id.*) Utensils are the heaviest items the Plaintiff may lift without pain. (R. 47.) Additionally, the Plaintiff states that up to about 2010, he used to have hobbies such as fixing radios or other household items, however he can no longer do them. (R. 49.)

### C.    Vocational Expert Testimony

Vocational Expert ("VE") James Breen also appeared at the hearing and offered testimony. (R. 57-62.) The ALJ asked the VE whether a hypothetical person with the Plaintiff's same age, education, and work experience, who retained a

residual functional capacity ("RFC") to perform medium level work that involved occasionally balancing, stooping, kneeling, crouching, and climbing stairs and ramps; but could never climb ladders, ropes, or scaffolds; and must avoid concentrated exposure to hazards – could perform the Plaintiff's past work. (R. 60.) The VE opined there were a host of jobs that the hypothetical individual could perform, but the hypothetical individual could not perform the Plaintiff's past work. (*Id*.) The ALJ then asked whether there would be jobs available if the ALJ reduced the exertion level to light. (R. 62.) The VE opined that all of the Plaintiff's past jobs would be eliminated. (*Id*.) The ALJ then asked if the exertion level was reduced to sedentary without changing any other restrictions, what jobs would be available. (*Id*.) The VE opined that there would be jobs available; specifically: circuit board tester, order clerk, and charge account clerk. (*Id*.)

###    D.    The ALJ's Decision

On February 28, 2014 the ALJ issued a written opinion denying the Plaintiff's application for DIB because the Plaintiff had not been disabled between the Plaintiff's May 11, 2007 alleged date of disability onset, and the Plaintiff's September 30, 2010 last date of insured status. (R. 17-25.) The ALJ found at step one that Plaintiff had not engaged in any substantial gainful activity in the relevant period between the Plaintiff's onset date and his last date of insured status. (*Id*.) At step two, the ALJ concluded that through the last date of insured status, the Plaintiff had the severe impairments of degenerative disc disease of the lumbar spine, obesity, Diabetes Mellitus, and neuropathy. (*Id*.) The ALJ indicated at step

three that through the last date of insured status, the Plaintiff did not have an impairment or combination of impairments that met or medically equaled the criteria of impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 19-20.) The ALJ then determined that Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), limiting his activity to occasionally balancing, stooping, kneeling, crouching, crawling, and/or climbing ramps; and never climbing ladders, ropes, or scaffolds. (*Id.*) The ALJ concluded at step four that the Plaintiff could not perform his past relevant work. (R. 23.) At step five, based upon the VE's testimony and the Plaintiff's age, education, work experience, and RFC, the ALJ concluded that the Plaintiff could perform jobs existing in significant numbers in the national economy, leading to a finding that he is not disabled under the Social Security Act. (R. 24.)

## **DISCUSSION**

### I. **ALJ Legal Standard**

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments

enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 416.920(a)(4).

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The plaintiff bears the burden of proof at steps 1–4. *Id.* Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II.     Judicial Review

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d

at 841; *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that the ALJ's decision must be affirmed even if "reasonable minds could differ" as long as "the decision is adequately supported") (citation omitted).

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a plaintiff, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must at least minimally articulate the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must adequately articulate his analysis so that we can follow his reasoning . . . ."); *see also Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the Commissioner, not the court. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *see Scrogham v. Colvin*, 765 F.3d 685, 698

(7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence").

## III.   Analysis

The Plaintiff argues that the ALJ made five errors: (1) the ALJ improperly failed to call a medical expert to testify as was required by SSR 83-20; (2) the ALJ improperly assessed the nature of the Plaintiff's disability because he did not consider the Plaintiff's impairments in conjunction; (3) the ALJ improperly assessed whether the Plaintiff's disability met the requirements of all relevant Listings, and failed to support his conclusion with any analysis; (4) the ALJ improperly evaluated the Plaintiff's residual functional capacity (RFC) because the ALJ's findings were not supported by substantial evidence and improperly weighed the Plaintiff's usage of a walker; and (5) the ALJ did not pose the correct hypothetical questions to the vocational expert. The Court agrees with the Plaintiff's first argument, and remands the case for further proceedings. Because this conclusion requires reversal, other alleged errors need not be addressed at this time.

### A.   The ALJ's Decision not to Call a Medical Expert to Testify was Improper

The Plaintiff, citing *Parker v. Astrue* 597 F.3d 920, 924-25 (7th Cir. 2010), first argues that the ALJ's choice not to enlist the aid of a medical expert to infer the Plaintiff's proper disability onset date contravenes SSR 83-20. The Commissioner, relying on *Eichstadt v. Astrue*, 534 F.3d 663, 667 (7th Cir. 2008), responds that SSR 83-20 only suggests an ALJ should use a medical expert to assist inferring a disability onset date. However, before determining whether the ALJ was

required to call a medical expert to infer the Plaintiff's date of disability onset, the Court must address a prerequisite question: whether the Commissioner's May 9, 2012 finding that the Plaintiff's disability met Listing 1.02A and the Plaintiff was disabled in his application for SSI, is considered a finding of disability in Plaintiff's application for DIB, triggering the application of SSR 83-20.

This exact question, "what type of affirmative finding of disability by the ALJ is necessary to trigger SSR 83-20's procedures for finding the onset date of disability?" was expressly considered in *Campbell v. Chater*, 932 F. Supp. 1072, 1075 (N.D. Ill. 1996). In *Campbell*, the plaintiff applied for DIB on April 23, 1992 alleging a disability onset date on December 11, 1984. *Campbell*, 932 F. Supp. at 1073. While the ALJ ultimately denied Campbell's DIB application for lack of evidence establishing disability through Campbell's December 31, 1989 last date of insured status; during Campbell's August 4, 1993 administrative hearing, the ALJ orally stated he would have found Campbell disabled if the issue concerned disability through her hearing date. *Id*. At her second administrative hearing, the ALJ similarly attributed little weight to Campbell's new post-date-of-last-insured medical records, and again found Campbell not disabled. *Id*.

Campbell's appeal argued a similar theory to the Plaintiff at bar: because Campbell's disability, a heart problem that progressed slowly until the point of disability, is of non-traumatic origin, and because the ALJ stated during the hearing that he would have found Campbell currently disabled, SSR 83-20 was triggered and the ALJ erred by failing to use the assistance of a medical advisor in

inferring a disability onset date. The Commissioner, in turn, argued that SSR 83-20 only comes into play *after* the Commissioner formally finds a claimant is disabled, and the ALJ's hearing statement was not a formal finding of disability.

The court squarely rejected the Commissioner's argument stating: "the only precondition to the ALJ's resort to SSR 83–20 should be the fact that the ALJ has found such disability—and not the particular manner in which the ALJ has articulated that finding." *Id.* at 1075 (finding that SSR 83-20 can be used to assist determining whether a claimant is disabled in the first place, and also to guide the inference of when the disability began).

The Court agrees with the *Campbell* court's reasoning, and finds the Commissioner's May 9, 2012 SSI disability finding was considered a finding of disability for Plaintiff's DIB application, triggering the application of SSR 83-20. Plaintiff's SSI disability finding occurred prior to the Plaintiff's DIB administrative hearing. As such, the ALJ would have had access to this disability finding during the Plaintiff's DIB hearing. Likewise, even though the Plaintiff's SSI disability finding occurred after her date of last insured; it lends strong credence to the Plaintiff being disabled at the time of her DIB hearing. Much like *Campbell*, Plaintiff's instant SSI disability finding is no different than the disability finding that triggered SSR 83-20 in *Campbell*, as both disability findings occurred after the last date of insured status. Consequently, the relevant question is now whether the ALJ should have recruited a medical expert to infer the Plaintiff's date of disability onset in the case at bar.

Where, as here, a claimant is found disabled but it is necessary to decide whether the disability arose at an earlier date, the ALJ is required to apply the analytical framework outlined in SSR 83–20 to determine the onset date of disability. *Briscoe*, 425 F.3d at 352. The onset date of disability is defined as "the first day an individual is disabled as defined in the Act and the regulations." SSR 83–20, 1983 WL 31249, at *1 (1983). In the case of slowly progressive impairments, SSR 83–20 does not require the impairment to have reached the severity of a listed impairment before onset can be established. *Id*. at *2. Instead, "[t]he onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a continuous period of at least 12 months or result in death." *Briscoe*, 425 F.3d at 352 (quoting SSR 83–20 at *3).

For disabilities of non-traumatic origin, such as the Plaintiff's, SSR 83–20 requires the ALJ to consider three things when determining the onset date of disability: the claimant's allegations, the claimant's work history, and medical and other evidence. SSR 83-20 at *2. The date alleged by the claimant is the "starting point" in determining the onset date, and that date should be used if it is consistent with all available evidence. *Id*. at *2, 3. As for the claimant's work history, "[t]he day the impairment caused the individual to stop work is frequently of great significance in selecting the proper onset date." *Id*. at *2. Nevertheless, the medical evidence is "the primary element in the onset determination" and the chosen onset date "can never be inconsistent with the medical evidence of record." *Id*. "This does

not mean that a claim is doomed for lack of medical evidence establishing the precise date an impairment became disabling." *Briscoe*, 425 F.3d at 353; *see also* SSR 83–20 at *2. "In such cases, the ALJ must infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process, and should seek the assistance of a medical expert to make this inference." *Briscoe*, 425 F.3d at 353 (citing SSR 83–20 at *2) (internal quotation marks omitted).

The ALJ must give a "convincing rationale" for the onset date selected. SSR 83–20, at *3. When a claimant challenges the onset date selected by the ALJ, "the issue is whether there is substantial evidence in the record to support the date chosen by [the ALJ], not whether an earlier date could have been supported." *Henderson ex rel. Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir.1999); *quoting Stein v. Sullivan*, 892 F.2d 43, 46 (7th Cir.1989).

Turning to the case at bar, as an initial matter, the Court agrees with the Commissioner that SSR 83-20 does not require the ALJ to retain a medical expert's assistance when inferring a disability onset date. *See Eichstadt*, 534 F.3d at 667 (7th Cir. 2008) ("[SSR 83-20] describes something that the ALJ 'should' do, rather than something he or she 'must' do or 'shall' do, implying that the ultimate decision is up to the ALJ"). While the Plaintiff argues that *Eichstadt* is distinguishable, as Eichstadt did not provide enough records for it to be necessary for the ALJ to call medical expert testimony; this argument is not persuasive because it ignores the 7th Circuit's strong proclamation that the wording of SSR 83-20 facially vests the ALJ

with discretion in using a medical expert to infer a disability onset date. Similarly, Plaintiff's own interpretation of *Eichstadt* undermines his argument because were SSR 83-20 truly a requirement, the ALJ would be required to enlist a medical expert regardless of whether a plaintiff provided enough records for the medical expert's testimony to be necessary. However, even though SSR 83-20 does not require the ALJ to enlist the help of a medical expert to infer the Plaintiff's date of disability onset, the ALJ's failure to do so prevented the ALJ's disability onset judgment from having a legitimate medical basis, and therefore the Court cannot say the ALJ's opinion is supported by substantial evidence.[3]

Here it appears the ALJ examined the required SSR 83-20 elements: allegations, work history, and medical evidence, within the ALJ's step-four RFC determination. For purposes of SSR 83-20, the ALJ began his analysis by correctly examining the Plaintiff's allegations, work history and activities of daily living, and considering the Plaintiff's medical records, including those after the Plaintiff's date of last insured status. (R. 21-22.) The ALJ was correct to mention that the Plaintiff's medical records between 2005 and 2007 generally supported the Plaintiff's alleged symptoms, and that the Plaintiff's medical records ended in December of 2007, not resuming until five and a half years later on April of 2012. (*Id.*) However, while the also ALJ correctly noted that these facts did not necessarily establish the Plaintiff was disabled during the relevant time period, the ALJ's analysis was deficient in

---

[3] Here the ALJ did not explicitly consider the Plaintiff's exact date of disability onset. However, if the ALJ nevertheless conducted the requisite analysis, his failure to refer to SSR 83–20 by name should not be fatal. *Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir. 1989); *citing Lichter,* 814 F.2d at 435 (implying that an ALJ need not refer to SSR 83–20 specifically if he applies the requisite analysis).

that it prevents the Court from saying his determination was grounded in a legitimate medical basis.

Under SSR 83-20, the ALJ did not have enough information to firmly establish the Plaintiff's date of disability onset and committed reversible error when he failed to enlist the aid of a medical expert in inferring an onset date consistent with the medical record. *See Parker*, 597 F.3d at 925; *see also Henderson*, 179 F.3d at 513 ("of [the three SSR 83-20] factors, the medical evidence "is the most important factor, and the chosen onset date must be consistent with it").

Here, the ALJ acknowledged that there were "significant gaps in the claimant's history of treatment," finding that the Plaintiff did not begin treating again until April of 2012 when he resumed treatment with Dr. Dabhade. (R. 22.) To that end, Dr. Dabhade rendered an April 6, 2012 opinion finding the Plaintiff had chronic low back pain with degenerative joint disease of the lumbar spine with spinal stenosis; chronic neck pain with cervical radiculopathy; chronic knee pains with severe arthritis and severe limitation in mobility; Diabetes Mellitus uncontrolled with peripheral neuropathy; obesity; and gait disorder with back and leg pains and spasms. (R. 346.) Similarly, in Dr. Dabhade's opinion, the Plaintiff was totally disabled and was not able to engage in any gainful activity. (*Id*.)

While the ALJ acknowledged Dr. Dabhade's April of 2012 opinion found the Plaintiff completely disabled; the ALJ only attributed limited weight to Dr. Dabhade's opinion because "[p]art of Dr. Dabhade's period of treatment occurs before the DLI, and he was reporting within the bounds of his professional

certifications; however, his opinion was rendered on April 6, 2012, and nothing in the opinion would indicate that it was intended to apply on or before the DLI [last date of insured status]." (R. 23.)

SSR 83-20 instructs that an ALJ should call a medical advisor unless the medical record is complete enough to unambiguously fix the correct onset date. *See Lichter v. Bowen*, 814 F.2d 430, 434-35 (7th Cir. 1987). By the ALJ's own admission, Dr. Dabhade's failure to indicate whether his opinion applied on or before the Plaintiff's last date of insured status was an ambiguity preventing the ALJ from fixing a disability onset date firmly grounded in the medical record. The medical records from 2005 through 2007 establish the Plaintiff's disability as being progressive in nature. This progressiveness was further highlighted by the Plaintiff's symptoms increased severity presented in Dr. Dabhade's April of 2012 medical examination, and was further corroborated by the Commissioner's finding that the Plaintiff met Listing 1.02A in his application for SSI. In these circumstances where a plaintiff is conclusively found disabled, and prior evidence is at very least "ambiguous" regarding the possibility that the onset of [the Plaintiff's] disability occurred before the expiration of their insured status, the ALJ should turn to SSR 83-20 to make the necessary retroactive findings. *See Parker*, 597 F.3d at 925 (*citing with approval Grebenick v. Chater*, 121 F.3d 1193, 1201 (8th Cir. 1997) ("even were the lack of records properly considered an ambiguity in the record, the ALJ should still have recruited the ALJ"); *see also Gutka v. Apfel*, 54 F.Supp.2d 783, 787–88 (N.D. Ill. 1999) (finding that, even though the ALJ did not

expressly find the claimant disabled, he should have followed procedures set forth in SSR 83-20 in light of an uncontroverted physician's opinion that the claimant was disabled).

A medical expert would have helped fill in this gap by performing a longitudinal review of the available records pertaining to the Plaintiff's condition, including Dr. Dabhade's April 6, 2012 medical opinion, and providing information as to what inferences could be drawn about the Plaintiff's disability status around Plaintiff's last date of insured status. Similarly, the medical expert would have allowed the ALJ to make proper inferences about Dr. Dabhade's April of 2012 medical opinion, as the ALJ's conclusion that "Dr. Dabhade's opinion was not intended to apply prior to the DLI" is not supported by substantial evidence. This is because the ALJ had no support for this assertion, and indeed it appears the opposite conclusion is more likely true, notably because the Plaintiff's impairments were progressive in nature, and the Plaintiff's disability was severe enough to meet Listing 1.02A just one and a half years after the Plaintiff's last date of insured status. Absent any proper inferences made by a medical expert, the record was far from being "complete," and therefore, the ALJ should have recruited a medical expert to properly establish the Plaintiff's disability onset date.

## CONCLUSION

For the foregoing reasons, the Plaintiff's Motion for Summary Judgment [Doc. No. 20] is granted and the Commissioner's Cross-Motion for Summary

Judgment [Doc. No. 21] is denied. This matter is remanded to the Commissioner for further proceedings consistent with this Order.

**SO ORDERED.**                    **ENTERED:**


**DATE:** ___**March   30,   2017**___

**HON. MARIA VALDEZ**
**United States Magistrate Judge**